Carl E. Trulock, Respondent, *v.* Kings County Iron Foundry, Inc., Appellant.

First Department, April 30, 1926.

Brokers — commercial broker — action to recover commissions on production of purchaser ready, able and willing to buy entire assets and franchises of defendant corporation — alleged purchaser refused to buy without certified statement of accounts — said statement was not part of terms and certificate was not furnished by defendant — there was no meeting of minds of purchaser and seller — plaintiff alleged employment by president and assistant secretary of defendant — sale was not in usual course of corporate business and plaintiff had burden of showing specific authority in officers to employ him — verdict in favor of plaintiff is contrary to instructions that sale was unusual business and specific authority must be shown — charge was inadequate — certain requests to charge were erroneously refused.

The plaintiff cannot recover commissions on the theory that he produced a purchaser ready, able and willing to buy the entire assets and franchises of the defendant corporation, for while the plaintiff's evidence establishes that the price quoted was agreed on by the purchasers, they refused to buy unless a certificate of accounts was furnished to them and the defendant refused to furnish such certificate and had not agreed in the terms of sale to supply the purchasers with a certificate. Therefore, there was never a meeting of the minds between the alleged purchasers and the defendant, since the condition imposed by the alleged purchasers was not agreed to by the defendant.

Furthermore, the plaintiff bases his entire claim upon authority which he states he received from the assistant secretary and the president of the defendant corporation to make the sale and their agreement to pay him a commission, and he did not show that the defendant corporation gave the assistant secretary and president specific authority to engage the plaintiff to sell the entire assets and franchises of the corporation nor did he show that two-thirds of the stockholders had consented to the sale.

The officers of a corporation have no implied power to transact unusual business on behalf of the corporation, and where, as in this case, the business transacted is unusual, the person relying upon the authority of the officers must show that they had specific authority to act for the corporation.

The verdict of the jury in favor of the defendant was contrary to the law as charged by the court which was that the contract entered into between the officers of the defendant and the plaintiff was unusual and not in the regular course of business, and that the burden was upon the plaintiff to establish direct authority in the officers to make the contract sued upon, since it appears that there was no evidence in the record showing that the officers of the defendant had been given any direct authority to make the contract.

Furthermore, the charge by the court was entirely inadequate to cover the case, since it was mainly devoted to a discussion of the rules relating to the preponderance of the evidence and the weighing of testimony by the jury and did not purport to state the rules of law particularly applicable to the facts and situations involved.

It was error for the court to refuse to charge that the plaintiff so far as this transaction was concerned, was bound to know the nature and extent of the authority of the officers of the defendant and to charge that if the jury believed that the officers were acting in the business of the corporation, the corporation would be bound.

It was error also for the court to refuse to charge that under the laws of this State before the officers of a corporation can employ a broker to sell all the assets of the corporation, the consent of the holders of two-thirds of the stock of the corporation must be obtained.

It was error for the court to refuse to charge that the defendant could not sell its good will and all its assets to an individual or a corporation without the consent of the holders of two-thirds of the stock of the corporation.

The court charged on the request of the defendant to the effect that if the jury found that the plaintiff was engaged by the officers of the defendant to perform the agreement upon which he bases his action, then he was engaged to bring about an agreement between the defendant and another party which the defendant could not enter into or perform without the consent of the holders of two-thirds of the stock of the defendant corporation, to which charge the court added that there was nothing to show that the defendant attempted to carry out that agreement. The request and added charge were correct and under that charge the plaintiff was not entitled to recover, since the jury was informed that the plaintiff was engaged to bring about an agreement between the defendant and another, which the defendant could not enter into without the necessary two-thirds consent.

APPEAL by the defendant, Kings County Iron Foundry, Inc., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 4th day of March, 1925, upon the verdict of a jury, and also from an order entered in said clerk's office on the 19th day of March, 1925, denying defendant's motion for a new trial made upon the minutes.

*Oeland & Kuhn [Herbert C. Smyth* of counsel; *Edward J. A. Rook* with him on the brief], for the appellant.

*Frederick Klein [Alexander Rose* of counsel], for the respondent.

MERRELL, J.    The action was brought by the plaintiff to recover the sum of $11,500 alleged by the plaintiff to be his due as brokerage

commissions for procuring a customer for all the corporate assets of the defendant for the sum of $230,000, on an employment by the defendant. The plaintiff, at the time he alleges he was employed to procure a customer for the purchase of the property and assets of the defendant corporation, was himself connected with a corporation known as the Sanborn Sectional Weight Company located at Larchmont, N. Y., and engaged as a jobber in buying and selling sash weights. The defendant corporation owned and operated a foundry for the manufacture of sash weights. The plaintiff testified that on an occasion in the month of February, 1922, he was at the foundry of the defendant corporation and sought to purchase a quantity of sash weights for future delivery. At that time the defendant corporation was under the management of another corporation, known as the J. G. White Corporation. One Ralph L. Perkins, an officer of the J. G. White Corporation, was serving temporarily as assistant secretary and general manager of the defendant corporation. Perkins was acting under the employment of the J. G. White Corporation, and, although nominally, for the time being, assistant secretary of the defendant corporation, represented the J. G. White Corporation, which was at the time managing the business of the defendant corporation. One Walter Rautenstrauch, also connected with the J. G. White Corporation, was at that time acting as president of the defendant corporation in connection with the management of the defendant's business by the J. G. White Corporation. Both Perkins and Rautenstrauch received their compensation from the J. G. White Corporation. Neither of them received compensation from the defendant, and neither of them was a stockholder or director of the defendant corporation. The plaintiff testified that on the occasion of his visit to the defendant's foundry for the purpose of purchasing a supply of sash weights for future delivery, he spoke to Perkins about such purchase and that Perkins told him he did not know whether he could bind the company for future delivery as the business might be sold. Plaintiff testified that he then told Perkins that he knew some parties who were interested in getting into the foundry business, and if it was true that the business was going to be sold, would he, Perkins, care to have him submit or offer it to them; that Perkins stated that he would let him know, and that a day or two later Perkins advised the plaintiff by telephone that " they would be glad to have me offer the property to responsible parties." Plaintiff further testified that he then told Perkins that the first thing they would want to know would be the price and that the plaintiff would want to know the commission, and that Perkins named a price of $230,000 in round numbers, and that

it was agreed that said sum should include the commission of five per cent to the plaintiff. Plaintiff further testified that he submitted the matter to his clients, and that they were interested, and that he so advised Perkins, and that an appointment was made to visit the property and plant; that an engineer and an accountant representing the prospective purchasers visited the plant and looked over the property; that the accountant was shown the figures and balance sheets of the defendant corporation, and that the plaintiff and the accountant and engineer were told that the annual balance sheet for the previous year was then in the hands of an accountant being prepared in its final form; that later on a meeting was held at the office of the J. G. White Corporation, which was attended by Perkins, Mr. Loughran, a stockholder, Mr. Pope, identified with the defendant corporation, Mr. Rautenstrauch, and Mr. Winters, the accountant who had examined the books of the defendant corporation in behalf of the prospective purchasers; that Mr. Stickney, the engineer who was associated with the purchasers, was also present at this time. Plaintiff testified that at .that meeting Rautenstrauch informed Loughran that the prospective purchasers were ready to do business, and that they wanted to see the final completed balance sheet signed so as to know that the business was as it had been represented; that Loughran wanted to know what they were prepared to pay, to which Winters answered that they were prepared to pay the quoted price of $230,000; that Rautenstrauch then told Loughran that, of course, the prospective purchasers were entitled to see the signed balance sheet so that they would know the business was as it was represented; that Loughran suggested that they then call on a Mr. Walter Kuhn. At the time of these negotiations, to which the plaintiff testified, the capital stock of the defendant corporation was owned by the following named persons: Loughran, already mentioned, owned twelve and one-half per cent of the stock; two sisters of Loughran owned, respectively, twelve and one-half per cent and fifteen per cent of the stock. The balance of the capital stock, sixty per cent, was held in trust for the estate of Daniel S. Loughran, deceased. On the day following the meeting at the office of the J. G. White Corporation a meeting was arranged at the office of Mr. Kuhn, who was one of the trustees of the Loughran estate. At this meeting there were present the plaintiff, a Mr. McCoy, and Mr. Winters, the prospective purchasers, and the engineer, Stickney. Loughran introduced the plaintiff and the would-be purchasers to Kuhn, and then left the conference. At this meeting the plaintiff testified that he told Kuhn that they had been quoted a price of $230,000 and that they had had several meetings and had gone over the

plant and property and some of the books, and that they were prepared to close the transaction at that price; that Kuhn wanted to know where they received that figure from, and the plaintiff told him that it had been quoted to him by Perkins and confirmed by Rautenstrauch; that Kuhn stated there must be some mistake, and that while the business could be sold at a proper price, the company was asking $340,000; that Mr. McCoy, one of the prospective purchasers, then started to leave, stating that he was not interested in any price of $340,000 but was interested in the property at $230,000.   The plaintiff further testified that after Winters and the engineer had examined the plant and books of the defendant, he had a meeting with Rautenstrauch and Perkins at the office of the J. G. White Corporation, and that Perkins there informed Rautenstrauch that the negotiations were proceeding satisfactorily, and that a meeting with the purchasers had been arranged at lunch that day, and that the purchasers wanted to see some balance sheet and wanted to get that from the accountants.   The plaintiff testified that under the offer made to him, and which he transmitted to the prospective purchasers, they were to receive the entire assets of the corporation, its foundry and real estate, its good will, bills receivable, and all other assets of every nature and description; in short, that the purchase was to be of the going business of the defendant; that the purchasers were to assume the defendant's liabilities, and were to purchase and take over all of the assets of the defendant corporation.   The plaintiff further testified that representations had been made to the purchaser as to what property they were to take over, but that, while the books of the defendant corporation had been examined by Mr. Winters, the accountant representing the prospective purchasers, Winters, in behalf of the purchasers, wanted the written certificate of the defendant corporation that the balance sheet which he had prepared accurately reflected the true condition of the defendant corporation.   Plaintiff testified: " We wanted that figure, that condition, in writing, so as we would know it was authoritative."   Plaintiff was asked on cross-examination: " Q. In other words, before they would enter into an agreement, they wanted a signed statement as to the assets and liabilities of this concern; isn't that right?   A. Naturally. Q. They wanted that?   A. Certainly.   Q. All right; but they didn't get it, did they?   A. No, sir.   Q. Then in view of the fact that they did not get the signed statement or balance sheet, they would not sign an agreement; isn't that right?   A. We were told that we would get it.   We knew what it was presumed to contain because the business had been shown to us; the figures and books and so forth had been shown to Mr. Winters.   We simply wanted a signed

statement to know that it was the same as had been represented at the time to us. There had to be something in writing as a basis. Q. That is right. That was another condition that Mr. Winters exacted, wasn't it, that he wanted a certified balance sheet before he would sign an agreement, isn't that right? A. Why, certainly. You have to have a certified balance sheet. Q. But he didn't get it, did he? A. We wanted that to substantiate what had been told to us. Q. But he did not get such a thing? A. No, we never got that. Q. And he exacted that as a condition of signing the contract of sale; isn't that right? A. Yes. Q. You did not sign any agreement that day, did you? A. We did not."

Winters testified that only upon the defendant's procuring for the purchasers the certified balance sheet of the defendant corporation corresponding with the balance sheet which he had prepared, were the purchasers ready, willing and able to go through with the transaction. In the original contract which the plaintiff claimed was entered into between him and Perkins, the assistant secretary of the defendant, no condition was mentioned as to the furnishing of such certified balance sheet by the defendant corporation. That condition appears to have been imposed by the would-be purchasers before they would enter into any contract. No one on behalf of the defendant ever agreed to furnish such certified balance sheet and none was ever furnished.

The plaintiff bases his entire claim upon authority which he says he received from the assistant secretary of the defendant corporation to procure a purchaser of the entire assets of the corporation for $230,000, and which employment he testified was later confirmed by Rautenstrauch, the nominal president of the defendant corporation. It appears very clearly from the evidence that there never was any meeting of the minds of those representing the defendant corporation, and authorized to speak, and the would-be purchasers. The testimony shows that there never was any acceptance of the offer made by the plaintiff, except upon the condition that the certified balance sheet be furnished by the defendant. It, therefore, appears that there never was any meeting of the minds of the parties, and that the plaintiff did not procure a customer for the defendant's property ready, able and willing to purchase the property for $230,000. The plaintiff at the trial did not call either Perkins or Rautenstrauch. He made no attempt to prove the adoption of any resolution by the board of directors of the defendant corporation confirming the contract. No attempt was made to show that the contract was with the consent of the holders of two-thirds of the stock of the defendant corporation. It appeared from the evidence without dispute that the board of directors had

never conferred upon Perkins any authority to negotiate a sale of the property of the defendant corporation or to employ the plaintiff, and it affirmatively appeared that there was no meeting of the stockholders of the defendant corporation to vote upon the proposed sale. Rautenstrauch denied ever employing the plaintiff to effect a sale of the property. Perkins testified that Rautenstrauch had told him to enter into negotiations for a sale of the property at $230,000, and to carry the negotiations as far as he could and that then he, Rautenstrauch, would endeavor to complete the deal. Both Perkins and Rautenstrauch testified that no authority had ever been given them, or either of them, to make a contract with the plaintiff whereby the plaintiff was employed to procure a purchaser for the defendant's property.

At the close of the evidence in the case the court submitted to the jury the broad proposition as to whether or not the plaintiff made the trade through the president of the defendant corporation, and instructed the jury that if they believed that in pursuance of plaintiff's employment he procured a purchaser ready, able and willing to buy the property and who was ready to go ahead with the trade, their verdict should be for the plaintiff; otherwise, they should find for the defendant. The jury returned a verdict in plaintiff's favor for $13,540. Upon the rendition of the verdict counsel for the defendant moved to set aside the same as contrary to law and upon all the grounds mentioned in section 549 of the Civil Practice Act, excepting inadequacy of damages. Defendant's motion to set aside the verdict was denied, and the order appealed from was entered thereon.

I am of the opinion that the verdict of the jury was unsupported by the evidence and was contrary to law, and that under the evidence the plaintiff should not have recovered a verdict. In the first place, as before suggested, there was no meeting of the minds of the parties. Assuming the plaintiff acted with authority, he did not produce a purchaser for the defendant's property ready, able and willing to purchase the same at the price stated. The evidence on the part of the plaintiff conclusively shows that the would-be purchasers never were ready or willing to take the property, except upon the written certificate of the defendant corporation that the balance sheet prepared by the accountant Winters correctly reflected the actual condition of the affairs of the defendant corporation. This certificate was never furnished and, therefore, the condition imposed by the would-be purchasers was never met. In the second place, the alleged employment of the plaintiff by the assistant secretary of the defendant corporation was without any authority in law. Under well-settled principles of the common

law of this State a corporation cannot dispose of its entire corporate assets or even an integral part thereof without first obtaining the consent of the holders of record of at least two-thirds of the outstanding shares of the stock of the corporation who are entitled to vote thereon. Not only is this a principle of the common law, but was many years since engrafted into the statutory law of this State. Originally, in this State, where a corporation contemplated a sale of its property, the unanimous consent of the stockholders was required. (*Abbott* v. *American Hard Rubber Co.*, 33 Barb. 578.) Later on the requirement was relaxed by statute, and at the time of the alleged agreement which the plaintiff claims to have negotiated, the statute required generally the consent of the holders of two-thirds of the stock of a corporation to permit a transfer of all of its assets. Section 16 of the Stock Corporation Law of 1909 (as amd. by Laws of 1920, chap. 396),* in effect at the time of the alleged negotiations, provided generally, as a condition precedent before a sale or conveyance by a corporation of all of its assets, that the consent of two-thirds of the stockholders should be obtained at a meeting of the stockholders duly called for that purpose. In *Matter of Timmis* (200 N. Y. 177) a corporation engaged in the business of lithographing and printing sought to sell what was known as its " calendar department." It was claimed in that case by those who were seeking to dispose of said department without obtaining the consent of two-thirds of the holders of stock of the corporation, that the sale was in line with the ordinary business of the corporation, and that such sale did not violate the requirements of section 16 of the Stock Corporation Law of 1909. The Court of Appeals held otherwise, and that even the sale of the calendar department of the corporation was of so integral a part of the corporation as to require the necessary consent of the stockholders. Judge VANN, writing for the Court of Appeals in *Matter of Timmis*, said (at p. 180):

" The appellant claims that the sale of the calendar department is in the line of its ordinary business; that it is a lawful corporate act, regardless of section sixteen and that it did not give to the dissenting stockholder the rights created by section seventeen.

" The substance of the sections in question was first enacted by chapter 638 of the Laws of 1893,† probably to meet the situation as it was left by a line of judicial decisions ending in 1892. The valuable opinion of Judge ALLEN in *Abbot* v. *American Hard Rubber*

---

* Now Stock Corp. Law of 1923, § 20; Id. § 45, as amd. by Laws of 1924, chap. 441.— [REP.

† Adding to Stock Corp. Law of 1892, § 33, as amd. by Laws of 1901, chap· 130.— [REP.

*Co.* (33 Barb. 578), after standing the test of time and criticism for thirty years, was followed by *People* v. *Ballard* (134 N. Y. 269). These cases and those which intervened established the law that a corporation cannot sell all its property, or even a part thereof so integral as to be essential for the transaction of its ordinary business, because such a sale is wholly or partly an act of self-destruction and a practical dissolution without compliance with law.   *   *   *

" The sale before us was not made in the ordinary course of the business of the corporation, for it was not organized to sell calendar departments, or any department that would involve going out of business *pro tanto.*   It was not a sale of calendars over the counter or on the road, but of the ' business assets and property,' including the good will, of an independent and important branch of its business, and the large price agreed upon indicates the actual value of what was sold.   The parent company lacked capital to carry on the department, and, as the learned counsel for the appellant states, ' the sale was a business necessity,' which implies that it was not in the ordinary course.   By the sale of the good will the corporation would be prevented from ever engaging in that kind of business again, and while not in form a sale of its franchise to that extent, it would be in effect, because it could no longer exercise its franchise to make and sell calendars.   One of the powers conferred by the charter would thus be parted with, and the right to carry on a line of business authorized by the law of its being would be permanently gone.   It could not do a kind of business duly authorized by its charter as it had before.   As an arm of a living man may become paralyzed and useless, so an arm of the appellant would become paralyzed and useless by a sale such as the one described.   As the living arm could no longer lift, or touch, or exercise its cunning, so the arm of the artificial being could no longer make calendars, or sell them, or enter into contracts relating thereto.   Its own action would result in complete paralysis of every power required to conduct a calendar department and to this extent it would go out of business.   Such a sale would, therefore, be corporate suicide to a certain extent, and to that extent a sale or abandonment of the charter.   While a natural person may do anything within the limits of his physical and mental capacity not forbidden by law, an artificial person can do nothing except as authorized by law. The sale in question would not be valid without resorting to section sixteen,   *   *   *."

In the case at bar the plaintiff is seeking to recover commissions upon the ground that he was employed to procure a purchaser of the *entire assets* of the defendant corporation.   It is far more violative of section 16 than was the attempted sale in the *Timmis* case,

where only a department of the corporation was sought to be sold without the consent of the stockholders. (See, also, *Matter of MacDonald*, 205 App. Div. 579.)

I am, furthermore, of the opinion that Perkins and Rautenstrauch, temporarily officers of the defendant corporation, were without power to sell all the corporate assets of the defendant, including its good will and bills receivable, and, if so, they were without power to bind the corporation to pay a commission to the plaintiff, as broker, for procuring a purchaser. The court decisions in this State clearly hold that the only justification by a broker in charging commissions is upon the assumption that a sale of the property will result. In *Rosenthal* v. *No. 1450 Broadway Corp.* (162 N. Y. Supp. 344) the Appellate Term, First Department, held that in an action brought to recover commissions claimed to have been earned by the plaintiff for the leasing of certain stores belonging to the defendant corporation for a term of four years and over with a right of renewal, where it appeared that the president of the defendant corporation was not authorized to enter into the lease and bind the defendant corporation, the plaintiff was not entitled to commissions in procuring the lease. The determination of the Appellate Term, upon appeal, was affirmed by this court (179 App. Div. 885). In *McCorry* v. *Wiarda & Company* (149 App. Div. 863) the Appellate Division, Second Department, held that the president of the defendant corporation had no implied power to sell the defendant's plant and machinery, and the plaintiffs were denied a recovery for commissions on the sale. The court in that case held that if there was any contract to pay commissions, it was made by the president of the corporation personally; that it was not within the apparent authority of a manufacturing corporation to sell its plant and machinery, and that its president could not bind it upon an agreement made in behalf of the corporation with brokers, and that it can never be presumed that the agent of the corporation has authority to transact business not authorized by the charter of the corporation. The court further held that persons dealing with corporations were bound to take notice of the limitations upon the powers of agents of such corporations. The action of *Berwin & Co., Inc.,* v. *Hewitt Realty Co.* (199 App. Div. 453; affd., without opinion, 235 N. Y. 608) was to recover on the part of the plaintiff a broker's commission for the sale of one-fourth of the real estate of the defendant corporation under a contract made with its president and treasurer. This court held, under the authority of *Matter of Timmis* (200 N. Y. 177); *Abbot* v. *American Hard Rubber Co.* (33 Barb. 578) and *People* v. *Ballard* (134 N. Y. 269) that a corporation could not sell all its prop-

erty or even a part thereof so integral as to be essential for the transaction of its ordinary business, because such sale is wholly or partly an act of self-destruction and practical dissolution without compliance with law. In the absence of power given by the certificate of incorporation to sell its real property, this court held that the defendant was not authorized to sell an integral part thereof without such authority from the stockholders, and where such a sale was unauthorized there could be no recovery of commissions on the part of a broker procuring a sale. It seems to me the *Berwin* case is a direct authority against any recovery by the plaintiff of commissions in the case at bar. The defendant corporation itself had no authority to sell all its corporate assets, except with the consent of at least two-thirds of its stockholders. There being no authority to enter into a contract of sale, there was no authority to hire the plaintiff as a broker to effect such sale, and there was no authority binding the defendant to agree to pay the plaintiff a commission. It was held in *Lyon* v. *West Side Transfer Co.* (132 App. Div. 777) that one seeking to recover commissions for procuring a purchaser must either show authority or ratification. In that case, while no authority was shown, a ratification by the corporation and the consummation of the sale were shown, and it was held that under such circumstances the broker was entitled to a commission for procuring a purchaser.

At the close of the entire case the defendant moved for a dismissal of the complaint. Such motion was made upon the denial on the part of the defendant's officers that they had any authority to make the contract upon which the plaintiff seeks to recover. While by the plaintiff's testimony there may have been some presumption as to the authority of the defendant's assistant secretary and president to bind the corporation, yet any presumption that existed was thoroughly rebutted by the testimony of both Perkins and Rautenstrauch that they had no authority to enter into such an agreement. There was no attempt on the part of the plaintiff to prove any authority in the persons with whom he claims to have dealt. I think the trial court erred in denying defendant's said motion to dismiss.

I am further of the opinion that the verdict of the jury in the case at bar was contrary to the law as charged by the court. Counsel for the defendant asked the court to charge the jury that the alleged contract entered into between the officers of the defendant company and the plaintiff was unusual and not in the regular course of business. In response to such request the court charged that the contract was unusual. In *Lyon* v. *West Side Transfer Co.*

29

(132 App. Div. 779) Mr. Justice CLARKE, writing for a majority of this court, said: " It was not conducted through a real estate broker nor at a fixed or customary fee, but the corporation was to be divested of all its property upon a certain price with an agreement that all above that price should go to the person procuring the customer. That certainly was an unusual and extraordinary transaction and required the party asserting it to prove the authority of the officers alleged to have made the contract."

At the request of counsel for the defendant the trial court further charged the jury that, as matter of law, the burden was upon the plaintiff to establish direct authority in the officers to make the contract sued upon. Such instructions became the law of the case, and the jury were bound to follow the same. The record is entirely barren of any evidence showing that the plaintiff had discharged the burden put upon him by the charge of the court, or made any attempt to establish direct authority in the defendant's officers to make the contract upon which the plaintiff seeks to recover.

I am further of the opinion that the trial court failed to properly or adequately instruct the jury as to the principles of law which governed their consideration of the proven facts. The charge of the court occupies but little better than a page and a half of the printed record. It is merely a statement as to certain elementary principles governing the conduct of the jury, concerning the preponderance of evidence, and the weighing of the testimony of witnesses. The court instructed the jury that the plaintiff was suing for a five per cent commission on an alleged sale which he claimed he was authorized by the defendant to make, of its property, for the sum of $230,000, and that such commission amounted to $11,500, and that the interest thereon amounted to $2,040; that the plaintiff had the burden of proof to establish that he was employed by the president of the company to make the sale, and that he produced a purchaser ready, able and willing to buy the property and pay therefor, and that he had not been paid. The jury were then instructed as to the form of their verdict, in case they found for the plaintiff or defendant. The court then instructed the jury: " If you find the plaintiff did make the trade through the president of the defendant company, and that he was to get five per cent commission as agent in selling this property for $230,000; and if you believe that in pursuance of that agreement he procured a purchaser ready, able and willing to buy the property' and who was ready to go ahead with the trade, and if you believe that the money has not been paid, your verdict will be for the plaintiff. If you do not believe that, or any part of that, your

verdict will be for the defendant." This completed the charge of the court, and seems to me to have been quite insufficient to obtain intelligent action by the jury. I think the court clearly erred, under the authorities hereinbefore mentioned, in charging the jury that the plaintiff might recover if the jury found that he made the contract through the president of the defendant company. Due exception was taken by counsel for the defendant to such charge.

Counsel for the defendant asked the court to charge the jury that the plaintiff was bound to know the nature and extent of the authority of Rautenstrauch, the president, and Perkins, the assistant secretary, of the defendant company, when dealing with them. The court declined to charge as thus requested, and stated that it had charged the jury that if they believed that Rautenstrauch was the president of the company and was acting in the business of the company, the company would be bound by what he did. Due exception was taken to this charge, and I think thereby reversible error is presented.

Counsel for the defendant further asked the court to charge the jury that the plaintiff was bound to know that any authority that the officers of the defendant had was derived from the statute law of the State of New York, the certificate of incorporation of the defendant and its by-laws. This the court declined to charge, because there was no evidence in regard to by-laws. To such refusal an exception was taken by counsel for the defendant.

Counsel for the defendant further requested the court to charge the jury that under the laws of the State of New York, before the officers of a corporation can employ a broker to sell all the assets of the corporation, the consent of the holders of two-thirds of the stock of the corporation must be obtained. The court declined to charge as requested, to which counsel duly excepted. I think the defendant was entitled to the charge requested, and that its refusal constituted error.

Counsel for the defendant further requested the court to charge the jury upon the evidence adduced in the case that there was no proof that the acts of the officers had been ratified or consented to by the holders of two-thirds of the stock of the defendant company. To this request the court stated: " I so charge, but I charge you that it is not necessary." To such ruling counsel for the defendant duly excepted.

Counsel for the defendant further asked the court to charge the jury that as a matter of law the officers of the defendant company had no implied authority to employ the plaintiff to sell the good will and all the assets of the defendant company. Such request

was declined by the court and an exception taken by counsel for the defendant.

Counsel for the defendant further asked the court to charge the jury that the defendant company could not sell its good will and all its assets to an individual or a corporation without the consent of the holders of two-thirds of the stock of the defendant company. The court declined to charge as requested, to which counsel for the defendant duly excepted. I think the request was proper and should have been charged, and that refusal to charge as so requested further constituted error.

Counsel for the defendant further requested the court to charge the jury that if they found the plaintiff was engaged by the officers of the defendant company to perform the agreement upon which he has brought action, then he was engaged to bring about an agreement between the defendant company and another party which the defendant company could not enter into or perform without the consent of the holders of two-thirds of the stock of the defendant company. To such request the court stated: " I so charge, but I also charge you that there is nothing showing that the defendant attempted to carry out that agreement." I think the charge made by the court was correct, and that under such charge the plaintiff was not entitled to recover a verdict, for the reason that, as charged by the court, the plaintiff was engaged to bring about an agreement between the defendant company and another party which the defendant company could not enter into or perform without the consent of the holders of two-thirds of the stock of the entire company, and that under such instructions there could be no recovery in the action.

Again, the court was asked by counsel for the defendant to charge the jury that, as matter of law, the burden was upon the plaintiff to establish direct authority in the officers to make the contract sued upon. The court charged as thus requested. In the absence of any proof by the plaintiff of direct authority in the officers to make the contract upon which he sought to recover, the jury were not justified in returning a verdict for the plaintiff.

I think the court's main charge to the jury was entirely inadequate. (*Matter of Taylor*, 197 App. Div. 865; *People* v. *Odell*, 230 N. Y. 481.) In the case last cited the Court of Appeals said (at p. 488): " The trial judge should not as a rule limit himself to stating good set terms of law culled from the codes and the reports. Jurors need not legal definitions merely. They require proper instructions as to the method of applying such definitions after reaching their conclusions on the facts." Judge ANDREWS in his dissenting opinion therein also said (at p. 494): " The charge is intended to aid

a jury of laymen in the decision of the material issues of a case. It is to point out what are the kind of facts, among a great number before them, some material and some immaterial, that bear upon these issues. It is to assist them in reaching a just result, to aid in securing a fair and impartial trial. None of these objects is attained by a mere statement of legal definitions. Some idea, at least, must be given of their bearing upon the concrete case at issue."

In the case at bar the jury received no instructions concerning the facts presented by the evidence or the rules of law governing the same. The instructions to the jury in response to requests by counsel for the defendant were contradictory and confusing and frequently erroneous. The charge, as a whole, must have left the jury in a confused state of mind as to the questions of fact to be decided and as to the principles of law controlling their action. However, I am of the opinion that under the evidence in the case and under the undisputed facts, the plaintiff was not entitled to recover a verdict, and that the trial court should have dismissed the complaint at the end of the whole case.

The judgment and order appealed from should be reversed, with costs, and plaintiff's complaint dismissed, with costs.

DOWLING, FINCH, McAVOY and MARTIN, JJ., concur.

Judgment and order reversed, with costs, and complaint dismissed, with costs.