RAYMOND BURNS, Appellant, v. CITY OF NEW YORK, Respondent, et al., Defendant.

First Department, May 20, 1958.

*Albert Cohn* of counsel (*Joseph N. Friedman* with him on the brief; *Harry H. Lipsig,* attorney), for appellant.

*Alfred Weinstein* of counsel (*Seymour B. Quel* with him on the brief; *Peter Campbell Brown, Corporation Counsel,* attorney), for respondent.

STEVENS, J.  This is an appeal by plaintiff from that part of a judgment entered in this action in the office of the Clerk, Bronx County, July 7, 1955, and resettled in said office July 15, 1955, which set aside a verdict in favor of the plaintiff as against defendant, the City of New York, and dismissed the complaint against the city.

The facts are fairly stated in the accompanying dissent by Mr. Justice McNALLY, and will not be reviewed here.

The verdict having been set aside and the complaint dismissed, the facts are taken in the light most favorable to the plaintiff, and " in determining whether the facts proved constitute a cause of action, give the appellant the benefit of every favorable inference which can reasonably be drawn " (*Faber* v. *City of New York*, 213 N. Y. 411, 414).

It is not disputed that the plaintiff herein on the morning of April 15, 1953, was shot and injured severely by patrolman Flynn.  The officer was dressed in civilian clothes and had completed his tour of active duty at 4:00 P.M., April 14, 1953.

The respondent contends that it is not liable because Flynn was not acting within the scope of his employment at the time that the acts were done.

In determining if there was evidence sufficient to raise a question of fact whether the acts complained of were committed within the scope of Flynn's employment a review of basic principles is required.

As was pointed out in one of the leading cases on the subject " There is, at this time, but little conflict of judicial opinion in respect to the general rule by which the liability of a master for the misconduct of his servant, resulting in injury to third persons, is to be tested and ascertained.  * * *  When the master is to be considered as having authorized the wrongful act of the servant, so as to make him liable for his misconduct, is the point of difficulty." (ANDREWS, J., in *Rounds* v. *Delaware, Lackawanna and Western R. R. Co.*, 64 N. Y. 129, 133.)

" When it is said that the master is not responsible for the wilfull wrong of the servant, the language is to be understood as referring to an act of positive and designed injury not done with a view to the master's service, or for the purpose of executing his orders." (*Cohen* v. *Dry Dock, East Broadway and Battery R. R. Co.*, 69 N. Y. 170, 174.)

In the case just cited plaintiff, while driving along a street in the city of New York, was stopped by a blockade of vehicles, leaving the rear part of his buggy dangerously near the defendant's track so that a car could not pass upon the track without striking it.  A car approached on the track driven by defend-

ant's employee who stopped, observed the situation and directed the plaintiff to move. The plaintiff promised to move as soon as he could. Thereafter, using profanity and threatening to get plaintiff "off some way or other," defendant's employee started his horses, the platform of defendant's car struck plaintiff's buggy and overturned it, causing injury.

The court said (p. 174): "The evidence should at least have been submitted to the jury. They were the proper judges of the motives and purposes of the driver, and of the character and quality of his acts."

In the *Rounds* case (64 N. Y. 129, *supra*) the defendant's brakeman ejected a trespasser from the train. The boy fell against a woodpile, which the brakeman knew was at that location, and rolled under the car and was injured. The rules prohibited anyone riding upon the platform of the cars.

The trial court (p. 132) refused to charge that the defendant was not liable " if the baggageman acted willfully and wantonly without authority from the defendant."

The Court of Appeals, in affirming the judgment, pointed out (pp. 137–138): " If the master, when sued for an injury resulting from the tortious act of his servant while apparently engaged in executing his orders, claims exemption upon the ground that the servant was, in fact, pursuing his own purposes, without references to his master's business, and was acting maliciously and willfully, it must, ordinarily, be left to the jury to determine this issue upon a consideration of all the facts and circumstances proved."

While it is for the court to pass upon the competency of the evidence, when the defense is that the act was not within the general scope of the servant's authority, it is for the jury to give effect to it. (See *Mott* v. *Consumers' Ice Co.*, 73 N. Y. 543, 550.)

It should be pointed out that although Flynn was assigned regular hours of active duty, he was in fact on call 24 hours a day and subject to duty at all times (Rules and Regulations of N. Y. City Police Department, No. 157). He was charged with a corresponding duty " at all times of the day and night, to protect life and property, prevent crime, detect and arrest offenders," etc. (Rules and Reg., *supra,* No. 155). In recognition of the existence of the duty and to facilitate its execution, Flynn was required to carry a service revolver at all times, and this might well have been a foreseeable consequence, though we do not so hold. The blowing of a whistle or the punching of a time clock did not serve as the line of demarcation in his employment.

" The degree of responsibility conferred upon the employee is an important consideration in determining scope of employment, for, as the court put it in *Cohen v. Dry Dock, E. B. and B. R. R. Co.* (69 N. Y. 170, 173): ' The master who puts the servant in a place of trust or responsibility * * * is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper * * * goes beyond the strict line of his duty or authority, and inflicts an injustifiable injury on another '." (FROESSEL, J., in *Becker v. City of New York*, 2 N Y 2d 226, 232.)

By reason of the peculiar nature of the policeman, Flynn's, employment, he did not cease to be an employee when his tour of active duty ended. It cannot be contended seriously, that an officer, not on active duty nor assigned to the narcotic squad, is without authority to arrest a narcotic violator or even a narcotic suspect. If this had been a valid arrest, unquestionably the city would have openly ratified Flynn's action.

Bearing that in mind much, if not most of the testimony of Nelson which was excluded, might have been admitted in evidence as against the defendant city, not necessarily to establish the truth of the content of the alleged conversations, as to establish the fact and nature of such conversations.

We refer particularly to Nelson's conversation with Flynn regarding the purpose of the proposed nocturnal excursion and their subsequent activities in alleged pursuance of the stated objective. This was conversation with a defendant who without question was an employee of the city and it could not at that stage be determined whether or not Flynn was acting within the scope of his employment.

Here the witness Nelson was available with ample opportunity afforded for cross-examination, the deprivation of which constitutes the principal justification for the hearsay rule. The fact that certain statements were made, as distinguished from their truth or falsity, was relevant upon the trial. Such statements were not offered as testimonial assertions, but they might well serve to indicate circumstantially the state of mind of Flynn acting thereafter. (See Richardson on Evidence [8th ed.], § 206 *et seq.*) For there are occasions when the intent of a servant in the doing of an act, or the nature and quality of the act done, become material.

To hold a master liable where there has been an excessive or erroneous use of authority, " it must be shown both that the servant intended to do on behalf of the master something of a kind which he was in fact authorized to do, and that the act, if

done in a proper manner, or under the circumstances erroneously supposed by the servant to exist, would have been lawful '' (*Osipoff* v. *City of New York*, 286 N. Y. 422, 427, citing Pollock's Law of Torts [14th ed.], pp. 72, 73).

If Flynn in fact had observed a narcotic violator, to notify the narcotic squad would have taken time, caused delay and probably resulted in the escape of the suspect. The question, therefore, of the scope of his employment, the intent with which he did the act, and whether, under the circumstances the act was one he was justified in doing on his master's behalf, were questions for the jury. (See *Casey* v. *Davis & Furber Machine Co.*, 209 N. Y. 24; *Simms* v. *Bergamo*, 3 N Y 2d 531.)

We think this case can be distinguished from the *Sauter* case (*Sauter* v. *New York Tribune*, 305 N. Y. 442) where, after two vehicles collided, the defendant's driver-employee, being called upon to give his license, struck the plaintiff. The parties were separated. The plaintiff went back of the truck and got down on one knee to look under the lowered tail gate to read the license number. While in that position, the defendant's driver went back to him and kicked plaintiff in the face. The court observed (p. 446) : '' The assault upon plaintiff was something more than imperfect performance of the duty to submit credentials when circumstances required; it was a positive refusal to act as impliedly directed by the employer New York Tribune, Inc., thereby constituting a willful departure from the employer's business and the furtherance of its interests.'' The court (p. 446) referred to the fact that the second attack occurred subsequent to plaintiff's request to see defendant's employee's license '' and at a time when plaintiff had walked away from Finnegan and had abandoned his efforts to exchange license numbers with him.'' (Cf. Restatement, Agency, §§ 236, 245, comments (d), (f) and illustrations 11, 12.)

Nor do we think this case falls within the orbit of the ruling in the *Pacheco* case (*Pacheco* v. *City of New York*, 11 Misc 2d 80, affd. 285. App. Div. 1031, motion for leave to appeal denied 309 N. Y. 1030). There the plaintiff joined willingly in the peregrinations of the officer, participated in the frolicsome activities which all too obviously were of a questionable nature, and on the basis of the plaintiff's testimony it was established clearly that the officer was not engaged in the discharge of police duties.

It is settled law that the mere fact that a servant, placed in a position of trust or responsibility, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury upon

another does not excuse the master when the servant is engaged in the general furtherance of the business of his master (*De Wald* v. *Seidenberg*, 297 N. Y. 335).

" A master who authorizes a servant to perform acts which involve the use of force against persons or things, or which are of such a nature that they are not uncommonly accompanied by the use of force, is subject to liability for a trespass to such persons or things caused by the servant's unprivileged use of force exerted for the purpose of accomplishing a result within the scope of employment." (Restatement, Agency, § 245; see, also, comments (d), (f); see *Curran* v. *Buckpitt*, 225 App. Div. 380; see, also, *De Wald* case, *supra*, where a superintendent of a building assaulted a tenant; 57 C. J. S., Master and Servant, § 575, and discussion thereunder.)

This principle received negative recognition in *Oneta* v. *Tocci Co.* (271 App. Div. 681, 683) where, in reversing judgment for plaintiff, it was pointed out " there was nothing in the nature of Gordon's employment which required that he use force." The character of a policeman's employment frequently, if not inevitably, involves the use of force.

" The doctrine of *respondeat superior* is grounded on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness. * * * Insistence upon *respondeat superior* and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care." (FULD, J., in *Bing* v. *Thunig*, 2 N Y 2d 656, 666 — hospital malpractice case.)

The concept of responsibility in this area is an expanding one. The tendency is to place on the master the risks of all those whose faults may be regarded as incidental to the enterprise, as it should be, rather than on the innocent victim. It is what Harper and James on Torts (p. 1377) refer to as the inevitable toll of lawful enterprise.

The view expressed in Justice HOLMES' famous dictum, " A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends " (*Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353), has no validity in application in this State, by reason of the Court of Claims Act (§ 8); *Bernardine* v. *City of New York* (294 N. Y. 361) and

numerous cases declaring or recognizing that immunity from suit no longer exists.

The trial court charged the jury on the law ably when it placed the case in the jury's hands, and the court itself recognized that if Nelson's testimony be believed there might be some basis for liability (11 Misc 2d 123).

However, there were certain questions asked of Nelson which, upon objection, were limited in applicability to Flynn, but which when repeated were not objected to, the city resting apparently upon the belief that they had an automatic or continuing objection. This is not so. But in fairness to the city it should be allowed to meet the issue raised.

It cannot be said on the record here as a matter of law, and in light of the views expressed herein, that the defendant city is or is not liable. Nor can it be said that because the servant had in part some motive of his own, he had lost sight of the interest of his master and the object of his employment, or that the act was not done in furtherance of his master's business and incident to the performance of Flynn's duties.

The triers of the fact must resolve the question if there was any evidence that the act of Flynn occurred within the scope of his employment, or was done with the express or implied authorization of the master. As has been pointed out, not every deviation from duty results in exculpation of responsibility.

The judgment insofar as appealed from should be reversed on the law and the facts and a new trial ordered, with costs to the appellant.

McNALLY, J. (dissenting). In this action for false arrest, assault and battery, and negligence, the jury's verdict in favor of the plaintiff-appellant in the sum of $50,000 was set aside and the complaint dismissed. The evidence relative to liability is as follows: John W. Nelson, who was a probationer with the Police Department from June 16 to November 20, 1951, an acquaintance of the defendant Flynn, testified that on April 14, 1953, at midnight, at a bar and grill, he had a talk with the defendant Flynn during which the latter informed Nelson that he had become a permanent member of the Police Department, whereupon Nelson congratulated Flynn. Nelson then said to Flynn: " I asked him if he would be interested in them (narcotic leads) because I thought, if he would make the arrest, he would look good as far as he was concerned on his record. There might be a promotion for him." Flynn responded that he was interested in such leads. Thereafter, Nelson and defendant started to make the rounds of various places in The Bronx, chiefly all-night diners and bars.

About 6:00 A.M. on April 15, Flynn and Nelson entered Freddie's Luncheonette located at the intersection of 168th Street and Boston Road in the borough of The Bronx. As they approached Freddie's Luncheonette, Nelson said to Flynn: "I told him to be particularly careful there because some of the fellows in there I had known by sight, I knew none of them personally, but I had known some of them by sight because I had worked in that precinct, and for him to keep his eyes open because there were a few there that might be kind of cagey." Upon entering Freddie's Luncheonette, Nelson proceeded to the back to make a telephone call. While in the telephone booth Nelson heard loud voices and he heard Flynn say: "I'm a police officer * * * this is a gun and I know how to use it." Nelson also heard plaintiff ask "why he (Flynn) was bothering him." Nelson rushed out of the telephone booth and forced his way through the crowd which had gathered, and before he could get to Flynn heard the report of a revolver. Nelson then saw the plaintiff lying on the floor bleeding profusely and that Flynn "had the gun in his hand."

Flynn's examination before trial, read into the record by plaintiff, established: On April 15, 1953, he was a policeman in the employ of the City of New York. On the morning of said day he visited Freddie's Luncheonette. He was then off duty. At Freddie's Luncheonette he searched the plaintiff for narcotics. While searching the plaintiff, Flynn's gun went off. The plaintiff had offered no resistance to the search. Flynn had no intention to shoot, although he had his finger on the trigger. Flynn was not assigned to the narcotic bureau.

Norwood McMillan, a guest in the diner, testified that on the morning of April 15, 1953, he was in Freddie's Luncheonette. He observed Flynn seat himself beside the plaintiff and start to go through plaintiff's pocket. He heard plaintiff say: "Do you know me, young fellow? If you don't leave me alone." McMillan then observed Flynn stand up, reach into his pocket, pull out his gun and place it against plaintiff's back. He heard plaintiff say: "Somebody, please tell this man to leave me alone. I'm not bothering anyone." McMillan then saw Nelson approach Flynn and heard Nelson say to Flynn: "He's not bothering you. He's just drinking coffee." Flynn responded: "I'm not paying any attention to you. I'm going to search him." Flynn then directed plaintiff to stand up with his back towards his gun. The gun was cocked; as Flynn swayed back and forth, the gun went off. McMillan did not hear Flynn say that he was a policeman.

Fay Feaster, another patron, testified that he witnessed the occurrence and stated the circumstances substantially as had McMillan. Feaster heard Flynn say to the plaintiff: "See this, this is a gun. * * * See the trigger, the trigger is cocked. Put your hand up." He also testified that he did not hear Flynn state that he was a policeman.

Plaintiff testified that on April 15, 1953, he was 46 years of age, married, that he then and for about one year prior to the occurrence had owned and operated a luncheonette at Boston Road and 167th Street. The hours of operation of the luncheonette were from 6:00 A.M. till about 5:00 P.M., seven days a week. Prior to the luncheonette business, plaintiff for about eight years had been a cab driver. On the morning of April 15, 1953, plaintiff, as on prior occasions, went to Freddie's Luncheonette for a cup of coffee. He seated himself at a stool; defendant Flynn was seated next to him. Plaintiff testified that Flynn put his arms around him and then started to search him. When Burns protested, Flynn responded: "You feel that in your back. That's a gun stuck in your back." Thereafter, while he was being searched, the loaded gun went off causing the injuries complained of. Plaintiff did not recall that Flynn told him that he was a policeman. Plaintiff's testimony is that Nelson was seated on a stool next to Flynn at the time of the occurrence, although Nelson's testimony is that he was in a telephone booth at the time.

Plaintiff read the deposition of Timothy Gassett, a policeman assigned to the 42d Precinct, who attended the scene of the occurrence in his official capacity immediately after the event, who identified Flynn as being present at Freddie's Luncheonette after the occurrence.

Sergeant James J. Collins, assigned to the 42d Precinct, testified that he attended Freddie's Luncheonette on the morning of April 15, 1953, in response to a radioed direction to do so. He testified that Flynn was assigned to the 48th Precinct whereas the occurrence took place within the 42d Precinct. Flynn told Collins: "This is the result of the apprehension and search of a suspected person."

It is uncontradicted that on April 14, 1953, Flynn was assigned to the 48th Precinct. Flynn had performed a tour of duty from 8:00 A.M. to 4:00 P.M., and was not required to return to duty until 4:00 P.M. of April 16, 1953. Flynn's probationary period had ended on April 13, 1953. Flynn had been assigned to Post 42; Freddie's Luncheonette was 2½ miles away from Flynn's post. Flynn was a member of the patrol force which

is charged with the duty of patrolling public streets, parks and thoroughfares. Uniformed police are required to report suspicious acts and circumstances on their posts to their superiors. Information regarding narcotic law violations was required to be reported by a uniformed policeman to his commanding officer, who was required to forward it to the narcotic bureau.

Appellant adverts to section 154 of the Code of Criminal Procedure which defines peace officers and includes within the definition a policeman of a city; also sections 177, 179 and 180 of the code which specify the occasions on which an arrest may be made without a warrant. None of said provisions of the code justifies the arrest here made. Section 435 of the Charter of the City of New York, also relied on by appellant, imposes the duties of preserving peace and preventing crime upon the " police department and force." No. 155 of the Rules and Regulations of the Police Department substantially repeats the general obligation of the Police Department and force as set forth in section 435 of the charter. No. 157 of the Rules and Regulations requires a member of the force to be subject to duty at all times; and No. 288 of the said Rules and Regulations requires a member of the force to carry a revolver at all times.

The view of the evidence most favorable to the appellant establishes that on the morning of April 15, 1953, at premises of Freddie's Luncheonette in the borough of The Bronx, after completion of a tour of duty at 4:00 P.M. of April 14, 1953, and with no official assignment until April 16, 1953, the defendant Flynn, upon information furnished to him by Nelson to the effect that Freddie's Luncheonette was frequented by narcotic law violators, instituted a search of the person of the plaintiff and in the course of said search, without provocation on the part of the plaintiff, shot and injured him. This aspect of the testimony resolves all questions involving the admission of evidence in favor of the appellant. There is no evidence that plaintiff was suspected of the commission of or involvement in any crime and by no conceivable standard can the search and arrest of the plaintiff be justified. The record is devoid of evidence of any emergency referable to any obligation on the part of the defendant Flynn as a police officer or a private citizen to act in the circumstances. In short, there is no basis whatever for a holding that any one of the acts performed by defendant Flynn on April 15, 1953, at Freddie's Luncheonette, in the borough of The Bronx, was within the scope of his employment as a policeman of the City of New York. Having failed to establish an act within the scope of Flynn's employment, there is no liability on the part of the respondent City of New York in respect of

the occurrence here involved. Vicarious liability of the kind here involved must be grounded on the employee's authority to act in the circumstances, and upon acts within the scope of the authority. (*Rounds* v. *Delaware, Lackawanna & Western R. R. Co.,* 64 N. Y. 129, 134.) That the act was indiscreet or in excess of authority may not preclude liability if it be related to the general scope of the employment. However, the authority and duty to act at the time of the occurrence must be present. At the time of the occurrence, Flynn was not acting as a policeman in the employ of the respondent; he was a volunteer sleuth motivated by personal considerations wholly unrelated to his duties and obligations as a member of the uniformed police of the respondent.

In *Sauter* v. *New York Tribune* (305 N. Y. 442) the defendant's truck driver kicked the plaintiff because he was endeavoring to copy the registration number of the truck after it had collided with plaintiff's bus. Although at the time of the occurrence the truck driver was in the employ of the defendant, the specific act of kicking the plaintiff, under the stated circumstances, was held to be beyond the scope of his employment, and the complaint was dismissed against the employer. In the instant case, at the time of the occurrence, Flynn was off duty, and not required to report until April 16, 1953; he had no official responsibility; there was no evidence of any emergency, breach of peace, or the commission of crime, or threatened harm to person or property. Flynn's then employment by the respondent was a coincidence of no more probative effect than if he had been employed by another, insofar as its relevance on the vicarious liability of the respondent.

*Sims* v. *Bergamo* (3 N Y 2d 531), *Osipoff* v. *City of New York* (286 N. Y. 422), and *Brown* v. *City of New York* (279 App. Div. 741), relied on by the appellant, are beside the point. *Sims* and *Osipoff* involved employees who in discharging duties related to their employment at the time of the occurrences did so imprudently and with unnecessary and excessive force. In *Brown* v. *City of New York* (*supra*), immediately prior to the occurrence the detectives heard a woman scream, which apprised them of an emergency indicating the desirability of their intervention. There an apparent emergency served to reactivate the detectives, who at the time were off duty but were proceeding to the 4th Precinct house at Varick and Beach Streets in the borough of Manhattan. In the case at bar, no circumstances are present indicating any emergency reactivating or recalling Flynn to duty in his official capacity.

In *Pacheco* v. *City of New York* (11 Misc 2d 80, affd. 285 App. Div. 1031), where the police officer shot and injured the plaintiff, this court affirmed a dismissal of the complaint against the City of New York. There, the trial court properly found, that, in the absence of any evidence of a violation of law, there is no official duty imposed on a member of the force who is off duty. Plaintiff's contention there was that he was in the custody of the detective, who shot him, for the purpose of questioning. Nevertheless, the court held that, in the absence of proof of any violation and in the light of circumstances indicating that the plaintiff and the detective were carousing, the plaintiff had failed, as a matter of law, to establish that the detective was in the performance of his duty as a police officer. Here, likewise, there was no proof of any violation or suspicion thereof and at best the activities of Flynn were those of an amateur detective, voluntary and outside the scope of his employment and authority as a uniformed policeman who had just completed his probationary employment.

It has been assumed all of the evidence adverted to is available to the plaintiff on this appeal. The fact is otherwise. Nelson's testimony of his conversation with Flynn, and Flynn's pretrial testimony that he was looking for narcotics, were admitted solely against Flynn, without objection on the part of the plaintiff. The same is true in regard to Flynn's statement to Sergeant Collins after the shooting that '' this is the result of the apprehension and search of a suspected person.'' On this state of the record there was no evidence before the jury establishing that the occurrence was within the scope of Flynn's employment. (Cf. *Creem* v. *Fidelity & Cas. Co.*, 132 App. Div. 241, 248.) The said evidence was properly excluded as to the respondent. Nelson's testimony was hearsay. Flynn's statement after the event was exculpatory and not spontaneous; his declaration or admissions are inadmissible to establish his authority or the scope thereof. (*Turner* v. *Northwestern Mut. Life Ins. Co.*, 232 N. Y. 171, 175; *State Bank* v. *Brocton Fruit Juice Co.*, 208 N. Y. 492, 495; *Taylor* v. *Commercial Bank*, 174 N. Y. 181, 191; *Schner* v. *Simpson*, 286 App. Div. 716; *Kelly* v. *United Dressed Beef Co.*, 249 App. Div. 586; *Golden* v. *Horn & Hardart Co.*, 244 App. Div. 92, affd. 270 N. Y. 544; *Molino* v. *City of New York*, 195 App. Div. 496; *Leary* v. *Albany Brewing Co.*, 77 App. Div. 6, 9, 10.) Moreover, said evidence served to demonstrate conclusively a violation of paragraph 39 of article 12 of the Manual of Procedure of the Police Department, requiring members of the force to transmit to their commanding officer information as to violations relating to narcotics. In so violat-

ing the manual, Flynn was acting contrary to, rather than within, the scope of his authority.

The judgment should be affirmed.

BREITEL, J. P., and RABIN, J., concur with STEVENS, J.; McNALLY, J., dissents and votes to affirm in opinion.

Judgment so far as appealed from reversed upon the law and the facts and a new trial ordered as to defendant, the City of New York, with costs to the appellant.