**Fernando VARGAS, Plaintiff,**

v.

**Pablo CORREA, Correction Officer, Bronx House of Detention for Men, and the City of New York, Defendants.**

No. 74 Civ. 1257 (JMC).

United States District Court,
S. D. New York.

March 3, 1976.

The Legal Aid Society Prisoners' Rights Project, New York City (William E. Hellerstein and Marjorie Smith, New York City), for plaintiff Fernando Vargas.

Corporation Counsel of the City of New York (W. Bernard Richland, Richard Steinberg and Thomas Burchill, New York City, of counsel), for defendant Pablo Correa.

## OPINION

CANNELLA, District Judge:

In this action for damages brought by Fernando Vargas (a prison inmate) against Pablo Correa (a prison guard) and the City of New York (Correa's employer), the Court finds for the plaintiff and against the defendant (Correa) in that Vargas' constitutional rights as protected by 42 U.S.C. § 1983 were violated when Correa physically attacked him.

## THE FACTS

The Court finds the facts in this case to be as follows: On February 10, 1974, plaintiff Fernando Vargas (then serving concurrent sentences of twenty (20) years upon a conviction of manslaughter and seven (7) years upon a conviction of possession of a weapon) was incarcerated in the New York City Bronx House of Detention, having been transferred from the Auburn Correctional Facility approximately two weeks earlier in connection with an indictment for attempted homicide then pending against him in the Bronx. The plaintiff, who is 5' 4" tall and weighed 116 lbs., was then incarcerated in that section of the institution referred to as Four South. At approximately 2:30 p. m. on February 10, the plaintiff and seven or eight other inmates were watching television. They had been watching a movie about Abraham Lincoln for about an hour and a half when the defendant Pablo Correa, a correction officer, came

along and changed the channel so that he could watch a basketball game. The television (which was provided for the inmates' use) is situated behind a row of bars in a corridor to which the prisoners have no access. It is turned on and off by the guards, who have access to a switch box which controls the electricity on the floor. Although the prisoners cannot change the channel manually in that the bars keep them approximately four feet from the television, a method had been devised whereby the inmates could change the channel through the use of a mop handle which fits through the bars.

After Correa had changed the channel, the inmates who had been watching television began to object. This minor dispute quickly developed into a heated argument between Vargas and Correa, with each vituperatively cursing the other. At this point, Correa "challenged" Vargas to enter the guard's corridor and change the channel himself. Correa then opened the gates which otherwise prevented Vargas from entering the corridor. Vargas passed through the two opened gates and changed the channel. Correa then attacked him and punched him so that he was thrown against the bars and onto the floor. As Vargas stood up, he picked up a chair, but quickly put it down when he saw Correa reach into his pocket for what Vargas assumed to be a knife. Although no knife was in fact drawn, Correa again attacked and hit Vargas. Correa then sounded an alarm and several other correctional officers rushed to the scene. Vargas never raised the chair over his head, or hit Correa.

As a result of the attack, Vargas' face and neck were hurt. He was taken to the medical clinic for treatment but refused to sign the doctor's report, which was not introduced into evidence. Vargas said that his neck and right hand were stiff and that he felt "all messed up."

## THE LAW

A. *Liability under 42 U.S.C. § 1983*

■ Based upon the above facts and applying the legal standard set forth in *John-*

*son v. Glick,* 481 F.2d 1028 (2d Cir. 1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973), the Court finds that plaintiff has proven a violation of 42 U.S.C. § 1983. In *Johnson* at 1029, the court of appeals held that a pretrial detainee's allegation that while he

> was being checked back into the House of Detention, Officer Fuller reprimanded Johnson and other men for a claimed failure to follow instructions; that when Johnson endeavored to explain that they were doing only what another officer had told them to do, Officer Fuller rushed into the holding cell, grabbed him by the collar and struck him twice on the head with something enclosed in the officer's fist;

stated a claim on which relief could be granted under § 1983.

Analytically, Judge Friendly declined to rely upon the eighth amendment's prohibition of cruel and unusual punishment, holding instead,

> that, both before and after sentence, constitutional protection against police brutality is not limited to conduct violating the specific command of the Eighth Amendment or, as in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), of the Fourth. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), must stand for the proposition that, quite apart from any "specific" of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law.

481 F.2d at 1032.

■ In determining whether or not a given incident rises to the level of a § 1983 violation, the federal courts are to be guided, but not bound, by the common and statutory law of the state in which the incident occurred, while at the same time taking cognizance of relevant federal decisions and scholarly comment. *See Jones v. Marshall,* 528 F.2d 132 (2d Cir. Nov. 24, 1975). A review of the relevant New York statutory and administrative provisions re-

veals a uniform proscription against the infliction of blows by guards on inmates in situations other than self-defense, escape, riot or the protection of other prisoners (New York Penal Law § 35.10(2); New York Correction Law § 137(5); 3 New York City Charter & Code § 623(4)–4.0(c)).

More significantly, in *Johnson v. Glick,* Judge Friendly set forth the following guideposts for the application of the due process standard in the prison setting:

While the *Rochin* test, "conduct that shocks the conscience," 342 U.S. at 172, 72 S.Ct. 205, is not one that can be applied by a computer, it at least points the way. Certainly the constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it, see Prosser, Torts § 9 (4th ed. 1971); still less is it as extensive as that afforded by the common law tort action for assault, redressing "Any act of such a nature as to excite an apprehension of battery," *id.* § 10, at 38. Although "the least touching of another in anger is a battery," *Cole v. Turner,* 6 Mod. 149, 87 Eng.Rep. 907, 90 Eng.Rep. 958 (K.B. 1704) (Holt, C. J.), it is not a violation of a constitutional right actionable under 42 U.S.C. § 1983. The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

481 F.2d at 1033. *See also Meredith v. Arizona,* 523 F.2d 481 (9th Cir. 1975); *Reed v. Philadelphia Housing Authority,* 372 F.Supp. 686, 690–92 (E.D.Pa.1974).

Applying the above criteria to the case at bar, the Court concludes that Vargas' constitutional rights were violated by Correa's attack on him. It was Correa who opened the gates to permit Vargas to enter the corridor, and it was Correa who began the physical altercation. The use of force by Correa was totally uncalled for in the situation and can in no way be said to have occurred as a result of Correa's attempts to "maintain or restore discipline." Rather, Correa's use of force was applied "maliciously and sadistically for the very purpose of causing harm." In fact, there was no need for the use of any force. Had Correa not opened the gate and thereby permitted Vargas to approach the television, a fight could not have occurred.

The Court is not persuaded by the argument that Vargas could have avoided any danger by refusing to go into the guard's corridor and that he therefore assumed the risk of being attacked when he did. The doctrine of assumption of the risk is applicable as a defense to an action based upon negligence, but has no place in the case of an intentional tort. In the case of an intentional tort, the inquiry is framed in terms of consent. *See* W. Prosser, Law of Torts § 18 (4th ed. 1971). Viewed from this perspective, it is at best fatuous to suggest that Vargas consented to being attacked by the guard.

The Court thus finds that Correa's attack of Vargas deprived Vargas of his due process right to be free from unprovoked attack and subjects Correa to liability under 42 U.S.C. § 1983.

**B.** *Jurisdiction over a Pendent Party*

Plaintiff also seeks an award of damages against the City of New York, Correa's employer, under New York law. Recognizing that under the Supreme Court's decision in *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d

109 (1973), New York City could not be sued pursuant to 42 U.S.C. § 1983, and having no jurisdictional basis upon which to sue New York City in federal court, plaintiff asks that this Court consider his claim against the City under the doctrine of pendent jurisdiction. The issue raised, unlike that dealt with by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), is one of pendent *parties* rather than one of pendent *claims.* As the Ninth Circuit Court of Appeals recently stated, the question which the Supreme Court specifically left unresolved in *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), is:

> Can a district court hear a party's state law claims against a named defendant over whom there is no independent federal basis for jurisdiction, where the nonfederal claims arise out of the same facts and circumstances as viable federal claims against other parties?

*Aldinger v. Howard*, 513 F.2d 1257, 1260 (9th Cir. 1975). To the above, this Court answers in the affirmative. The courts of appeals are almost unanimous in recognizing the power of a district court to exercise jurisdiction over a pendent party in circumstances such as exist in this case. (*See Almenares v. Wyman*, 453 F.2d 1075 (2d Cir. 1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800 (2d Cir. 1971) and *Astor-Honor, Inc. v. Grosset & Dunlap, Inc.*, 441 F.2d 627 (2d Cir. 1971), all per Friendly, J.) and the cases collected in *Moor*, 411 U.S. at 713–14 n.29, 93 S.Ct. at 1798, 36 L.Ed.2d at 612. *But see Aldinger v. Howard, supra.*)

■ Having determined that this Court has the constitutional power to hear the plaintiff's pendent party claim, the inquiry then becomes whether it is in the interest of "judicial economy, convenience and fairness to litigants" (*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966)) to exercise that discretion. In the instant case the discretionary considerations detailed by the Su-preme Court in *Gibbs* point strongly toward retention of jurisdiction. To begin, the pendent party issue, evident on the face of plaintiff's complaint, is now first raised by the City defendant after the trial has been completed. In addition, it is clear that plaintiff's federal claim was not only substantial, but was vindicated on the merits. This case was tried as a federal case and no proof was adduced which was not directly related to the federal claim.

In addition, this case was tried to the Court without a jury, thus negating any possibility of jury confusion. Further, the Court finds the recent decision of the First Circuit in *Bowers v. Moreno*, 520 F.2d 843 (1st Cir. 1975), persuasive. *See also Curtis v. Everette*, 489 F.2d 516, 519–20 (3d Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974). In *Bowers,* Judge Coffin expressed the opinion that the considerations in favor of exercising jurisdiction in a pendent party case are particularly compelling where the primary cause of action arises under federal law. (*Id.* at 847.)

The only consideration which even suggests a refusal to decide the pendent claim is that it involves somewhat unsettled questions of state law in an area where considerations of comity demand federal sensitivity to state interests. Nonetheless, in light of the other considerations detailed above, especially the fact that a trial to the court has been completed, this Court will exercise its discretion in favor of deciding the pendent claim against the City of New York.

### C. *Respondeat Superior*

Plaintiff's claim against the City of New York rests upon the doctrine of *respondeat superior.* The traditional rule regarding the liability of a master for the wrongful use of force by his servant is found in § 245 of the *First Restatement of Agency*:

> A master who authorizes a servant to perform acts which involve the use of force against persons or things, or which are of such a nature that they are not uncommonly accompanied by the use of force, is subject to liability for a trespass

to such persons or things caused by the servant's unprivileged use of force exerted for the purpose of accomplishing a result within the scope of employment. In essence, this was the test used by the New York Court of Appeals, in 1953 in *Sauter v. New York Tribune, Inc.,* 305 N.Y. 442, 445, 113 N.E.2d 790 (1953), and in 1957 in *Sims v. Bergamo,* 3 N.Y.2d 531, 169 N.Y. S.2d 449, 147 N.E.2d 1 (1957). The recent trend of the law, however, has been to expand employer liability for the intentional torts of his employee. Determining whether the employee committed an intentional tort to further his master's interest has involved courts in rather novel analyses of what the servant was intending to accomplish when he hit the *plaintiff.* Taking into account the trend toward expanding liability taking place in many jurisdictions, the American Law Institute rewrote § 245 in the *Restatement of Agency* 2d, as follows:

> A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant.

While this Court can find no specific authority for the proposition that the courts of New York have adopted the approach of the *Restatement 2d,* the decision of the Appellate Division, First Department in *Burns v. City of New York,* 6 A.D.2d 30, 174 N.Y.S.2d 192 (1958), suggests that on the facts of the instant case a New York court would find the "not unexpectable" standard of *Restatement* 2d more appropriate than the more restrictive test found in the earlier New York cases. In *Burns,* an off-duty policeman entered a diner allegedly frequented by drug dealers, "instituted a search of the person of the plaintiff and in the course of said search, without provocation on the part of the plaintiff, shot and injured him." *Id.* at 40, 174 N.Y.S.2d at 203 (McNally, J., dissenting). In reversing a directed verdict against the plaintiff, the court emphasized that "[t]he character of a policeman's employment frequently, if not inevitably, involves the use of force." *Id.* at 36, 174 N.Y.S.2d at 199. More significantly, the court noted that

> The concept of responsibility in this area is an expanding one. The tendency is to place on the master the risks of all those whose faults may be regarded as incidental to the enterprise, as it should be, rather than on the innocent victim. It is what Harper refers to as the inevitable toll of lawful enterprise. Harper and James on Torts, p. 1377.

*Id.* In light of *Burns* and the general trend of the law, this Court is of the view that when faced with a case involving the *respondeat superior* liability of a governmental entity for the intentional use of force by one of its employees whose job is in the nature of a policeman or guard, the courts of New York would apply a standard similar to that suggested by the *Restatement* 2d.

Comment i to § 245 of the *Restatement* 2d discusses the standard to be employed in situations involving fights following arguments.

> i. *Fights following arguments.* Although a servant is employed in a matter not involving the use of force, he may nevertheless cause the master to be liable for its use if he is in a position which requires contacts with third persons under circumstances likely to lead to disputes. In determining whether such conduct is in the scope of employment, the tendency of those engaged in that kind of work to settle disputes between them by the use of force is an important matter. Thus, a servant employed to sell intoxicating liquor might well cause the employer to be liable for harm caused by a fight starting over an argument as to whether the customer had received the right change, whereas a bank might not be found responsible to a customer for the act of a paying teller resenting a similar complaint by one cashing a check.

In the instant case the servant is employed in a job where the use of force is authorized in certain instances, and "which requires

contacts with third persons under circumstances likely to lead to disputes." While the Court hopes that the use of force is not regularly employed to settle prisoner-guard disputes, the prison setting is quite clearly one in which the use of force by guards is an ever-present possibility. Nonetheless, this Court finds that Correa's actions were so "dictated by personal motives" and so divorced from his work as a prison guard that the imposition of liability upon the City is unwarranted. (*See* Comment f, § 245 *Restatement* 2d.) The incident occurred because Correa wanted to watch a basketball game on a television set provided for the use of the inmates and did not arise out of any action within the scope of Correa's authority or in furtherance of his master's interest. *Compare Mathurin v. Government of Virgin Islands,* 398 F.Supp. 110, 117 (D.V.I.1975) (applying the *Restatement* 2d and holding that the beating was in part motivated by the police officer's desire to obtain confessions). While the Court believes that the doctrine of *respondeat superior* should be broadly applied when the servant is a prison guard and the use of force is thus not ordinarily unexpectable, the line must be drawn somewhere if the doctrine is to mean more than merely that the guard's employer is always liable for his intentional torts. Thus, when as here the intentional tort grows out of a dispute which is not job related, the doctrine is inapplicable. The Court therefore finds that the City is not liable for Correa's beating of Vargas.

## DAMAGES

■ In that the full extent of plaintiff's injury was that he was "hurting all over" and felt "all messed up", the Court finds that $250.00 will fairly and adequately compensate him for his pain and suffering.

■ Additionally, in that the Court finds Correa's attack to have been wilful and unjustified, the plaintiff is awarded $300.00 in punitive damages. This award is intended both to punish the defendant and to deter other prison guards from acting similarly. *See Sostre v. McGinnis,* 442 F.2d 178,

205 (2d Cir. 1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

## CONCLUSION

The Court finds that the plaintiff is entitled to judgment against the defendant Correa in the amount of $550.00. As to the City of New York, the complaint is dismissed.

The plaintiff shall submit a judgment on notice within two weeks.

SO ORDERED.